1  Michael J. McCue (Nevada Bar No. 6055)
   mmccue@LRLAW.com
2  John L. Krieger (Nevada Bar No. 6023)
   jkrieger@LRLAW.com
3  LEWIS AND ROCA LLP
   3993 Howard Hughes Parkway, Ste. 600
4  Las Vegas, Nevada 89169
   Tel:  (702) 949-8200
5  Fax:  (702) 949-8363
6
7  David D. Weinzweig (*pro hac vice* application to be submitted)
   dweinzweig@LRLAW.com
8  LEWIS AND ROCA LLP
   40 North Central Avenue
9  Phoenix, Arizona 85004
   Tel: (602) 262-5311
10 Fax: (602) 262-5358
11
   Attorneys for Plaintiff
12 LENS.COM, INC.
13
14              UNITED STATES DISTRICT COURT
15                  DISTRICT OF NEVADA
16 LENS.COM, INC., a Nevada corporation,     )
                                             )
17              Plaintiff,                    )
                                             )
18      vs.                                   )   **COMPLAINT**
                                             )
19 1-800 CONTACTS, INC., a Delaware           )
   corporation,                              )   **JURY DEMAND**
20                                            )
                                             )
21              Defendant.                    )
   _____ )
22
23         For its Complaint against defendant 1-800 Contacts, Inc. ("1-800"), plaintiff Lens.com,

24 Inc. ("Lens") alleges as follows:

25                        **NATURE OF ACTION**

26         1. 1-800 has long fashioned itself as a champion of consumers and an outspoken advocate

27 for open and robust competition.  1-800 has emphasized, in particular, the importance of informed

28 consumers who understand their alternatives.   Indeed, in its protracted battle with eye care

practitioners and manufacturers, 1-800 often decried the conduct of entrenched business interests

1   that zealously guarded their pecuniary self-interest at the expense of meaningful consumer choice

2   and greater competition.

3       2.    It was all a ruse.  This lawsuit is about 1-800's bold and unlawful crusade to obtain

4   or maintain its dominant position in the direct-to-consumer market for replacement contact lenses,

5   and the horizontal agreements that 1-800 extracted from its direct competitors to restrict output

6   and restrain trade.  Notwithstanding its carefully crafted image, 1-800 has battled to censor and

7   impede the universe of information that can be passed on to consumers; and conspired to ensure

8   that consumers never taste the fruits of competition.

9       3.    1-800 has engaged in a host of anticompetitive practices to obtain or maintain its

10  market dominance, restrict output and otherwise restrain trade, including:

11      a)    1-800 has manufactured a fictional collection of trademark rights and bullied

12  its competitors with false accusations of trademark infringement and frivolous litigation.

13      b)    1-800 has extracted horizontal agreements from its competitors, under threat

14  of litigation, to restrain trade and reduce output.  While fashioned as "settlements" of 1-800's

15  trademark infringement accusations, these horizontal agreements represent nothing but 1-800's

16  naked and unjustified power grab.  The onerous terms in these horizontal agreements far exceed

17  the scope of 1-800's actual limited trademark rights and afford greater relief to 1-800 than 1-800

18  could ever hope to achieve in litigation.  Competitors do not account for merit in their decision to

19  enter the settlements, but instead hope to avoid the crushing burden of 1-800's litigation apparatus.

20  Unlike 1-800, most of these competitors lack the size and strength to survive an extensive

21  trademark battle.

22      c)    1-800 understood and lamented the actual scope of its limited trademark

23  rights, and knew that its demands far outstripped its actual trademark rights.  1-800 was

24  nevertheless convinced that its competitors in the Relevant Market could not afford to fight 1-800,

25  which meant that 1-800 need not concern itself with actual trademark rights; 1-800 could instead

26  enforce the trademark rights it dreamed of.

27      d)    1-800 sued all competitors who had the temerity to refuse its demands.

28  Between 2005 and 2010 alone, 1-800 filed over 15 repetitive, predominantly sham lawsuits

against its competitors.  In these lawsuits, 1-800 asserted objectively baseless claims against its competitors without regard to merits and without a genuine interest in redressing grievances, but rather to harass, neutralize and vanquish its competition.  From extensive practice, 1-800's litigation apparatus has become a well-oiled machine.  Indeed, 1-800 now has a form complaint for its frequent lawsuits against competitors, which is always at the ready and requires little more than a new caption from lawsuit to lawsuit.

e)     When Lens refused to accede to 1-800's demands, 1-800 unleashed the litigation equivalent of a thermonuclear war in response to the damage equivalent of a hangnail. The district court determined that 1-800's infringement claim, if successful, might have fetched twenty dollars and fifty-one cents ($20.51) in lost profits.  Nonetheless, 1-800 poured enormous financial and other resources into the lawsuit, and pursued scorched-earth tactics usually reserved for bet-the-company litigation.  In the end, upon information and belief, 1-800 spent around $1,100,000 in attorneys' fees to chase $20.51 in damages.

f)     In late 2010, the district court tossed 1-800's lawsuit against Lens in a comprehensive 65-page decision.  By then, however, 1-800 had achieved its objective.  Lens had incurred in excess of $1,400,000 in litigation fees and expenses to defend against 1-800's frivolous infringement claims.

g)     Undeterred, 1-800 now hopes to revive its lawsuit and extend the pain based upon "new evidence."  Once again, however, 1-800 has no basis for its argument.  The federal court dismissed 1-800's lawsuit on December 14, 2010, while its so-called "new evidence" is from November 30, 2009.

4.     1-800's anticompetitive behavior has violated state and federal antitrust laws, the Lanham Act and Nevada common law.  Lens files this lawsuit to stop 1-800's misconduct and anticompetitive practices; to recover compensatory and treble damages; and to obtain injunctive and other equitable relief.  Lens further seeks declaratory relief in connection with 1-800's asserted trademark rights.

///

///

**PARTIES**

5.    Lens is a corporation organized and existing under the laws of the State of Nevada and is registered to conduct and conducts business in the State of Nevada.

6.    1-800 is a Delaware corporation with its principal place of business at in Draper, Utah.  1-800 conducts business and has business operations in the State of Nevada.  1-800 is a subsidiary of Fenway Partners LLP.

7.    Various other persons, firms and corporations, not named as defendants herein and presently unknown to Lens, have participated as co-conspirators with 1-800 and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct.

**JURISDICTION AND VENUE**

8.    The Court has subject matter jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, 28 U.S.C. § 2201, 15 U.S.C. § 15, 15 U.S.C. § 26 and 15 U.S.C. § 1121.  The Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a).

9.    This Court has personal jurisdiction over defendant 1-800, which purposefully directs its activities to Nevada residents, consummates transactions with Nevada residents and purposefully avails itself of the privilege of conducting activities in the State of Nevada, thus invoking the benefits and protections of Nevada law.  1-800 has conducted and does conduct business within the State of Nevada, has entered and continues to enter contractual relationships with residents of Nevada, has and continues to advertise to residents of Nevada, has and continues to solicit and accept orders from Nevada consumers, has and continues to ship orders to Nevada consumers, and offers an interactive website for Nevada consumers to access.  The exercise of personal jurisdiction over 1-800 is therefore reasonable and comports with notions of fair play and substantial justice.

10.   Venue is proper in the District of Nevada under 15 U.S.C. § 22 and 28 U.S.C. § 1391. 1-800 is found and transacts business in the District, and the District has personal jurisdiction over 1-800.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTERSTATE COMMERCE**

11.   1-800 is engaged in interstate commerce and the unlawful conduct described herein substantially affects interstate commerce.

**BACKGROUND**

*THE CONTACT LENS BUSINESS*

12.   Almost 40 million consumers in the United States wear replacement soft contact lenses for their vision correction needs.  Replacement soft contact lenses were first commercially available in 1987.

13.   Consumers must have a valid prescription to purchase contact lenses.  Prescriptions are available from eye care professionals ("ECPs") such as optometrists or ophthalmologists after an eye examination and fitting.  Contact lens prescriptions generally specify a particular brand name and are usually written for a period of one or two years.

14.   Consumers purchase their contact lens requirements from two different submarkets or channels:  the brick-and-mortar submarket (sometimes called the "traditional market"), and the direct-to-consumer submarket (sometimes called the "alternative market").

15.   Retailers in the traditional market operate from physical storefronts with at least one ECP on premises to examine and fit consumers who visit their storefronts.  These retailers include independent ECP offices, optical chains, mass merchandisers and wholesale clubs.

16.   The alternative market is comprised of retailers that sell replacement contact lenses directly to consumers via the Internet, telephone and mail.  Alternative retailers generally concentrate on replacement contact lens sales.  They do not operate from physical storefronts, do not have optometrists or ophthalmologists on premises, and do not offer eye examinations or fittings.

*THE RELEVANT MARKET AND BARRIERS TO ENTRY*

17. The relevant product market at issue here is direct-to-consumer sales of replacement contact lenses.  The relevant geographic market is the United States.  Hereinafter, the relevant product and geographic markets are collectively identified as the "Relevant Market."

18. The Relevant Market represents a separate and distinct submarket from the traditional, brick-and-mortar submarket (i.e., independent ECP offices, optical chains, mass merchandisers and wholesale clubs) based upon functional, financial, technical and economic factors.

a) In contrast to the Relevant Market, merchants in the traditional market operate from physical storefronts or professional offices, maintain at least one ECP on-site to examine and fit their customers, and issue contact lens prescriptions.

b) Traditional merchants do not set their prices based on prices in the Relevant Market, and vice versa. According to an economist with the Federal Trade Commission ("F.T.C.") who examined online and offline prices for contact lenses: "[O]ffline firms set prices on the assumption that most of their customers are unaware of online prices." *See* James C. Cooper, *Prices and Price Dispersion in Online and Offline Markets for Contact Lenses*, F.T.C. Bureau of Economics Working Paper (2006).

c) Upon information and belief, consumers who purchase their contact lens requirements from the traditional market do not generally consult the Relevant Market and are unaware of Relevant Market prices. Public awareness of the Relevant Market is limited due to various factors, including the dual function and financial interest of ECPs who generate substantial revenues from contact lens sales. According to 1-800: "As both a seller and prescriber, ECPs have little incentive to promote the portability of prescriptions that they issue. . . . ECPs have a powerful economic motivation to ensure that patients buy lenses from them. . . . [T]he fact that 92% of consumers purchase contact lenses directly from their prescriber and the prescriber affiliated retail location indicates that public awareness of one's ability to obtain lenses from alternative sellers and consumer awareness of consumers' rights are fairly limited." *See* Comments of 1-800 Contacts, F.T.C. Project No. R411002 (2004).

d) The Relevant Market and traditional market are governed by very different regulatory schemes that insulate the respective markets from competition on the merits. 1-800 has explained: "State laws are set up to protect this conflict of interest so that eye care practitioners, in some cases, can avoid competing on the merits, like service and price. They don't offer evening

service, they don't answer their phones on weekends, they don't inventory very many contact lenses and keep customers waiting longer than they might otherwise have to, and many don't offer direct shipment through their offices to the customer's home or office." *See* Comments of 1-800 Contacts, F.T.C. Project No. R411002 (2004).

e)    Actual price differences demonstrate the absence of cross-elasticity of consumer demand between the Relevant Market and the traditional, brick-and-mortar market. Upon information and belief, average contact lens prices in the Relevant Market are generally far less than those offered by ECPs and optical chains.  Consumers spend around 20 percent less for contacts in the Relevant Market.

f)    Demand in traditional market is unaffected by price changes in the Relevant Market.  Upon information and belief, price changes in the traditional market do not directly affect demand in the Relevant Market, and vice versa.

g)    Although some traditional merchants maintain an Internet presence, these "hybrid" retailers fall outside of the Relevant Market for various reasons, including price. According to an F.T.C. economist: "[H]ybrid pricing is substantially higher than that for pure online merchants. In fact, a closer examination of the data reveals that with the exception of Wal-Mart online, hybrid sites' pricing reflects the pricing of their offline counterparts." *See* James C. Cooper, *Prices and Price Dispersion in Online and Offline Markets for Contact Lenses*, F.T.C. Bureau of Economics Working Paper (2006).

h)    The Relevant Market provides substantial convenience to consumers, including the convenience of shopping at home.  No travel is necessary.  There are no lines. Consumers can submit their orders at any time, including evenings and weekends.

i)    In the traditional market, by contrast, consumers must physically travel from their work or home to merchants who operate from professional offices, shopping malls or detached retail structures; and incur the attendant travel costs associated therewith.  Consumers often must stand in line.  Merchants are geographically dispersed and use varied business models. Consumers are generally restricted to normal business hours.  Customers have inconsistent

1   experiences depending upon the staff members who serve them.  Multiple trips are required if and

2   when these retailers do not have a particular lens in stock, which must then be ordered.

3         j)     Convenience and travel are substantial factors for consumers who attach a

4   high value to their time; this is especially true of consumers who reside in rural areas far from

5   traditional retailers.  An F.T.C. Report explained:  "Research in transportation economics suggests

6   that individuals value urban travel time by automobile and public transit at between 75 and 178

7   percent of their wage rate.  At the average private hourly wage of $14.61 (December 2001), an

8   hour-long trip to Wal-Mart to buy replacement lenses has an implicit time cost of between $10.96

9   and $26.66.  That figure represents a markup of between 50 and 130 percent over the price of a

10   multipack. Therefore, the convenience cost of policies that impede entry by mail-order

11   replacement lens sellers could be substantial."  *See* Possible Anticompetitive Barriers to E-

12   Commerce: Contact Lenses (F.T.C. Mar. 2004).

13         k)     Unlike the traditional market, retailers in the Relevant Market utilize a

14   homogeneous business model, offer a uniform customer experience, and operate from one

15   location.

16         l)     Upon information and belief, certain customers in the Relevant Market have

17   unique circumstances that prevent them from turning to the traditional market, and vice versa.

18   Customers might not have Internet or telephone access, or might not have credit cards.

19         m)     Unlike the traditional market, the Relevant Market offers rapid home

20   delivery, and tracking capabilities for consumers to monitor the status of their order.  Relevant

21   Market consumers have become accustomed to, and expectant of, full control over their

22   transactions as well as the immediacy of such transactions.  These consumers much prefer an

23   online transaction that they initiate.  These considerations are "particularly important to consumers

24   who wait until the last minute to replace their lenses, consumers who may lose or tear lenses, and

25   consumers who travel.  Notably, many consumers are willing to pay a premium for convenience.

26   For example, approximately 33 [percent] of 1-800's customers choose express mail services,

27   despite the additional fee of $15-18 per order."  *See* Comments of 1-800 Contacts, F.T.C. Project

28   No. R411002 (2004).

n)      The Relevant Market is comprised of retailers that maintain huge inventories of product in order to instantly meet the diverse preferences of consumers across the United States. Consumers in the Relevant Market are thus ensured of a greater selection and immediate availability.  For instance, 1-800 carries 95 percent of the types of contact lenses that consumers purchase.  1-800 often boasts that it maintains the inventory of roughly 3,000 average ECP offices combined.

o)      Traditional merchants need not and do not maintain huge inventories.  Upon information and belief, 1-800 believes that its large inventory of contact lenses provides it with a competitive advantage over ECPs, optical chains and discount stores.

p)      Consumers in the Relevant Market have access to dynamic, interactive content on a real-time basis.  Unlike the traditional market, the Relevant Market facilitates opportunities for consumers to compare prices, obtain product information, obtain general information about vision and eye care, and ask vendors questions via e-mail or telephone. Customers are empowered by Internet search engines to gather and compare information about price and service from alternative retail sources.

q)      Upon information and belief, contact lens manufacturers have distinguished and continue to distinguish between the Relevant Market and traditional market in regards to price, products and relationship terms.  Manufacturers have historically refused to distribute particular products in the Relevant Market, and have often entered exclusive contracts with traditional merchants that prohibited Relevant Market sales.  Indeed, until 2007 or so, nearly all major manufacturers of contact lenses refused to sell their products directly to retailers in the Relevant Market and prohibited their distributors from doing so, too.

r)      ECPs have long advocated that the Relevant Market is separate and distinct from traditional channels based on various factors; from the total service experience to patient wellness considerations.   In addition, ECPs have long battled to erect unique obstacles for consumers and retailers in the Relevant Market.  *See* Comments of 1-800 Contacts, F.T.C. Project No. R411002 (2004).

19.   The Relevant Market is characterized by significant barriers to entry and expansion. For instance:

a)      Minimum efficient scale.  A prospective entrant must acquire and possess a substantial inventory of replacement contact lenses to attract consumers and meet their demands with prompt shipment.   A prospective entrant must likewise acquire distribution rights from manufacturers to a minimum portfolio of replacement contact lenses to attract consumers to its retail websites and to persuade additional manufacturers to sell their products through the would-be entrant's website.  It must also attract enough customers to cover its substantial operating expenses.   Upon information and belief, 1-800 has expressed that its inventory serves as an effective barrier to entry in the Relevant Market.

b)      Administrative, promotional, advertising and operating expenses. Prospective entrants must invest enormous sunk costs into their business before distributing a single contact lens – none of which can be recovered if the venture fails.  Entrants must, for instance, ramp up supply; again, without any promise of sale.  Entrants must invest substantially in the information systems and Internet infrastructure necessary to support customer sales.  Entrants must also locate, hire and train personnel, meet payroll, manage inventory, and purchase or lease equipment and real estate.  Entrants must also incur promotional expenses to introduce their business to and attract the general public; and related continued expenses for collateral material, an Internet presence, etc.  Given 1-800's propensity to sue all competitors, entrants should include substantial litigation expense as a price of admission.

c)      Market concentration, a dominant incumbent and entrenched buyer preferences.  1-800 has dominated the Relevant Market for several years, and its market power remains unchecked.   These factors, coupled with 1-800's low marginal costs, discourage prospective entrants in the Relevant Market.

d)      1-800's conduct.  1-800's anticompetitive conduct and practices also serve to deter and prevent prospective competitors from entering the Relevant Market, and thus protect 1-800's dominant position.   1-800 has invested enormous financial resources to ensure that consumers lack confidence in 1-800's competitors; and its frequent threats and lawsuits against

competitors prevent competition on the merits.  To begin with, nascent competitors who must fund litigation are unable to lower retail prices.  More generally, however, prospective entrants are less likely to enter the Relevant Market in the first place after learning that 1-800 sues its competitors for trademark infringement as a matter of standard operating procedure.

e)      Close relationships.   The Relevant Market is uniquely dependent upon relationships with manufacturers and consumers.  Prospective entrants must establish and maintain such relationships.

*1-800 CONTACTS*

20.   1-800 operates in the Relevant Market.   1-800 sells replacement contact lenses directly to consumers with valid prescriptions who place orders by telephone, mail and the Internet.

21.   1-800 describes itself as "the market leader in the field of replacement contact lenses" and "the largest seller of contact lenses to American consumers."

22.   1-800 boasts that it sells "as many contact lenses in one day as 2,500 retail optical shops combined and more contact lenses than all other online contact lens retailers combined."

23.   1-800's customers are located throughout the United States.  On the Internet, 1-800 operates under the domain name www.1800contacts.com.

24.   Upon information and belief, 1-800 has possessed and maintained a dominant share of the Relevant Market at all times material here, with a consistent market share in excess of 55 percent.  In April 2004, 1-800 informed the F.T.C. that it controlled 70 percent of the Relevant Market.

25.   1-800 is consistently the most expensive or among the most expensive Internet sources for consumers to purchase their replacement contact lenses.  In November of 2006, an F.T.C. economist reported that 1-800 was among the most expensive online retailers of contact lenses, while two competitors, Coastal Contacts and Contact Lens Discounts, offered among the lowest prices.  1-800 has sued both.

///

///

1

*1-800 CONTACTS: GENERIC NAME AND WEAK TRADEMARK*

2    26.  1-800 was founded in February 1995 as "1-800-LENSNOW," but changed its name

3    to "1-800 CONTACTS" in July 1995.  Jonathan Coon, founder and CEO, explained the rationale

4    behind the change as follows:  "[W]e knew [the name] would separate us from everyone else in

5    the industry and give us a significant advantage with every advertising dollar we spent.  People

6    never forget the phone number."

7    27.  Allen Hwang is the Chief Marketing Officer at 1-800.  Mr. Hwang explained the

8    rationale behind the name change as follows: "1-800 CONTACTS is an easily memorable name

9    and enabled us to benefit from competitors' advertising, *i.e.* consumers would call us after seeing a

10   Lens Express ad."  *See* Jamie Huish Stum, *A Rose By Any Other Name*, ENTREPRENEUR

11   MAGAZINE, Feb. 2009.

12   28.  After 1-800 changed to its new generic name, the company experienced an

13   immediate and substantial bump in sales without the need for any advertising.  According to

14   ENTREPRENEUR MAGAZINE: "Without spending a dime on advertising, 1-800 CONTACTS

15   received 2,000 calls the first month, producing $38,000 in revenue."  *See id.*

16   29.  1-800 has registered several trademarks in the U.S. Patent and Trademark Office,

17   including:

18
19

| MARK | REG. NO. | DATE |
|------|----------|------|
| 1800CONTACTS | 2,731,114 | January 21, 2003 |
| 1 800 CONTACTS | 2,675,866 | July 1, 2003 |

20
21

22   These registrations are, in whole or in part, on the Supplemental Register, meaning that 1-800

23   does not enjoy the presumption of ownership, the presumption that the marks are valid, or the

24   exclusive right to use these marks based on the registrations.

25   30.  Since at least 2004, 1-800 has known and publicly lamented the fact that it does not

26   hold and cannot hold property rights in the 1-800 CONTACTS telephone number or Internet

27   address.

28

31.   On May 21, 2004, 1-800 filed its Form 10-K report with the Securities and Exchange Commission for the fiscal year ended December 31, 2003.  1-800 disclosed that:  "We also have obtained the rights to various Internet addresses, including but not limited to www.1800contacts.com, www.contacts.com and www.contactlenses.com. We cannot practically acquire rights to all addresses similar to www.contacts.com.  If third parties obtain rights to use similar addresses, these third parties may confuse our customers and cause our customers to inadvertently place orders with these third parties, which could result in lost sales for us and could damage our brand.  As with telephone numbers, we do not have and cannot acquire any property rights in Internet addresses. As a result, we may be unable to retain the use of our Internet addresses.  The loss of our ability to use our Internet addresses would harm our business."

32.   On March 15, 2007, 1-800 filed its Form 10-K report with the Securities and Exchange Commission for the fiscal year ended December 31, 2006.  1-800 disclosed that: "The Company also has obtained the rights to various Internet addresses, including but not limited to www.1800contacts.com, www.contacts.com, www.contactlenses.com, www.evision.com and www.1800eyedoctor.com.  As with phone numbers, the Company does not have and cannot acquire any property rights in Internet addresses.  The Company does not expect to lose the ability to use the Internet addresses; however, there can be no assurance in this regard and such loss would have a material adverse effect on the Company's business, financial position and results of operations."

*LENS.COM*

33.   Lens operates in the Relevant Market.  It concentrates exclusively on direct-to-consumer sales of replacement contact lenses over the Internet.  Lens has been a direct competitor of 1-800 since incorporated in 1998.

34.   Lens has registered several trademarks in the U.S. Patent and Trademark Office, including but not limited to:

| MARK | REG. NO. | DATE |
| --- | --- | --- |
| 1-800 LENS.COM | 3,875,337 | November 16, 2010 |
| 1-800-GET-LENS | 2,571,563 | May 21, 2002 |

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

-13-

2398604

35.  Lens also holds common law trademark rights in "Contacts America" and "Just Lenses."

36.  Lens has long viewed the Internet as its central and exclusive means to advertise and build a brand.  Lens thus spends its entire ad budget on Internet advertising.  From 2003 to 2008 alone, Lens incurred between $3 million and $4.7 million in Internet ad expenses.

*A PARADIGM SHIFT TO INTERNET SALES AND THE
IMPORTANCE OF INTERNET SEARCH ENGINES*

37.  Upon information and belief, the Relevant Market began a fundamental transformation in or around 1999 from an emphasis on telephone and mail orders – which 1-800 had dominated – to an emphasis on Internet orders.  Upon information and belief, for instance, 1-800's Internet sales increased from less than 1 percent of total sales in 1999 to more than 50 percent of total sales in 2006.

38.  Contact lens retailers in the Relevant Market rely on Internet search engines, such as Google and Yahoo!, to inform consumers about their business and to direct consumers to their website.  Upon information and belief, Internet search engines have become the most important medium for retailers to reach consumers in the Relevant Market; and paid search marketing and sponsored links are accepted as the most reliable advertising method in the Relevant Market.  Consumers, in turn, depend on Internet search engines to search and navigate the massive universe of content on the Internet.

39.  Upon information and belief, consumers turn to Internet search engines to locate and research alternative retailers in the Relevant Market.  Consumers rarely use Internet search engines to locate particular retailers in the Relevant Market, and are unlikely to have particular retailers in mind from which to make their purchase.  Rather, these consumers most frequently use search terms such as – *contact*, *contact lenses*, *contact lens*, *contact*, *lenses* and *lens*.  Competitors who are precluded from using these generic terms are thus placed at a significant disadvantage.

*HOW SEARCH ENGINES WORK*

40.  Google, Yahoo! and other Internet search engines transform the chaotic and unwieldy universe of Internet commerce and content into a manageable, invaluable source of comparative information.  Search engines offer a central platform for consumers to gather and

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

compare information about alternative products, services, retailers and the like.  In short, Internet search engines such as Google and Yahoo! empower consumers to exercise meaningful choice and taste the fruits of competition.

41.   Upon information and belief, consumers receive substantial economic benefits from Internet search engines, including far lower search and transaction costs.  Search costs are inextricably intertwined with consumer choice and retail price.  Thus, lower search costs facilitate comparison shopping and lower prices, while higher search costs impede comparison shopping and facilitate higher prices and larger profit margins; especially for established vendors.

42.   Internet search engines work like this:  Consumers first type search terms into a text field to express their interest in particular content.  The search engine compares the search terms against its database of content and then applies an algorithm or formula to retrieve a list of relevant websites.

43.   Search engine results are divided into organic links and sponsored links.  Organic links are returned based upon their relevance to search terms.  Sponsored links are returned for websites that have paid for such placement.  Google has two sponsored link sections, which appear above and to the right of organic results.

44.   To become a sponsored link, advertisers bid on various keywords that, when entered into the search engine, are guaranteed to return a link to their website.  Advertisers can bid upon and select an unlimited number of keywords, including the same keywords.  The order and location of sponsored links depends on the sum bid for the keyword and the quality of the advertisement.  Advertisers thus do not purchase a particular placement in the list of sponsored link results.

45.   Google permits advertisers to designate their keywords with four match options.  A "broad match" will return a sponsored link in response to searches for the keyword, its plural forms, its synonyms, or similar phrases.    A "phrase match" will return a sponsored link in response to searches for a particular phrase, whether or not additional terms appear before or after the phrase.  An "exact match" will return a sponsored link whenever an exact phrase is entered.  A

"negative match" ensures that a sponsored link will not be returned under particular circumstances.

46.   Keywords are thus different from search terms and, when triggered, do not reveal a consumer's particular search.  1-800 has deliberately confused these distinct concepts (keywords vs. search terms) in its serial trademark lawsuits against competitors.

47.   Upon information and belief, sponsored links hold increased importance in the Relevant Market because Internet consumers place substantial value on easy access.  According to a sworn statement from Jason Mathison, 1-800's Internet Marketing Manager:  "Internet users generally place a high value on the easy accessibility of a website.  If too many pop-up advertisements appear on a website, users may become annoyed and may leave the site and/or choose not to return to the website in the future."

48.  Consumers are more likely to visit and do business with sponsored links. Consumers have greater trust in sponsored links.  Consumers also associate sponsored links with greater quality and value.

*1-800 HOSTILE TO PRO-COMPETITIVE CHANGES, BUT PREOCCUPIED UNTIL 2007*

49.   Upon information and belief, the Internet was celebrated in most corners for reducing consumer search costs and empowering consumers, but this virtue sparked concern at 1-800.

50.   Consumers encountered substantial search costs in the Relevant Market prior to the Internet because telephone and mail order reigned supreme.  That changed in the Internet age, when, upon information belief, consumers had instant access to comparative information that often exposed 1-800 as the most expensive option in the Relevant Market.

51.   Upon information and belief, 1-800 was largely unable to act on its frustration until January 2007, however, because it was immersed in a nasty, expensive and protracted battle with ECPs who had "proven to be enormously adept in arriving at new methods to thwart meaningful consumer choice and competition from alternative sellers," and contact lens manufacturers that used litigation against 1-800 to "impede the flow of information to the consuming public."

52.   On January 31, 2007, 1-800 announced that it had "resolved its longstanding supply

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

1   issue [and] signed long-term supply agreements with its three largest contact lens suppliers,"

2   which meant that 1-800 now had contracts with the four lens manufacturers that represented 98

3   percent of all soft contact lenses sales in the United States.  1-800 expressed satisfaction that the

4   agreements represented a final chapter in its extended battle.

5       53.  With its resources and attention untangled in 2007, however, 1-800 could and

6   would reposition its litigation arsenal to point downstream – at its competitors in the Relevant

7   Market.

8       *1-800'S SCHEME TO ELIMINATE COMPETITION UNDER GUISE OF TRADEMARK LAW*

9       54.  Upon information and belief, 1-800 officials devised a scheme to address their

10  concerns.  The scheme hinged on a fictional collection of trademark rights that 1-800 had

11  manufactured at least primarily to achieve various anticompetitive objectives, including but not

12  limited to reduced output, less competition and increased search costs.

13      55.  1-800 understood that consumer awareness and trust are the principal elements of

14  competition for Internet sales of replacement contact lenses.  Upon information and belief, 1-800

15  crafted a scheme to handicap its competitors on both fronts; that is, consumers would not know of

16  or not trust the competition, which ensured a significant competitive advantage.

17      56.  Beginning in or around 2005, 1-800 implemented a business practice, which called

18  for 1-800 officials to conduct weekly searches of "1-800 Contacts" and variations thereof on

19  Google, Yahoo! and other Internet search engines.  Upon information and belief, when its weekly

20  searches returned the sponsored link of a competitor, 1-800 would then accuse the competitor of

21  purchasing 1-800's trademark as a keyword from the Internet search engine.  Upon information

22  and belief, 1-800 sent cease and desist correspondence to all such competitors.

23      57.  Upon information and belief, 1-800 understood that it had no or little legal basis for

24  these serious accusations.  That is, 1-800 knew that a search for "1-800 Contacts" at

25  www.google.com would return a list of sponsored links from retailers that acquired a broad match

26  for keywords like "contact lens" and "contacts" – the most basic nouns in the marketing toolbox

27  of a contact lens retailer.  1-800 also knew that it did not own the exclusive right to use "1-800

28  contacts" in any event.

58.   Undeterred, 1-800 was determined to extract anticompetitive advantage with and through threats and litigation that forced competitors to incur substantial expense and/or limited the pool of words suitable for competitors to describe their product in the Relevant Market.

*1-800 EXTRACTS HORIZONTAL AGREEMENTS*

59.   Upon information and belief, 1-800 extracted horizontal agreements from several competitors, under threat of litigation, to restrain trade and reduce output.   While fashioned as "settlements" of 1-800's trademark infringement accusations, the terms of these horizontal agreements far exceed the scope of 1-800's actual limited trademark rights and afford greater relief to 1-800 than 1-800 could have achieved in litigation.

60.   Upon information and belief, 1-800 coerced horizontal agreements from competitors to prevent consumers from securing information about and links to alternative retailers on Internet search engines.   Each agreement represented an express horizontal promise to withhold information from consumers, restrict consumer choice, reduce output and otherwise eliminate competition.   The agreements eliminated actual or potential competition without limitation as to duration or geography.   1-800 boasted about these horizontal agreements and even sought to enforce them through the judicial process.

61.   Upon information and belief, the competitors were forced to settle without regard to merits in order to avoid the risk and expense of protracted litigation.   Unlike 1-800, most of these competitors lacked the size and revenues to withstand substantial litigation.

*THE LITIGATION MILL*

62.   Competitors that refused to accept 1-800's onerous horizontal agreement were promptly sued for infringement of two 1-800 marks.   1-800 knew that its trademark allegations had little or no merit, but continued to file and pursue them because its conduct had yielded and continued to yield tangible anticompetitive benefits.

63.   Upon information and belief, 1-800 understood that trademark litigation would be expensive for its competitors.   1-800 filed a slew of repetitive, sham lawsuits against its competitors in a short period to swamp them with litigation expenses.   1-800 sued its competitors

based on the anticipated consequences upon rivals without regard to the merits of prospective judicial decisions.

64.   Upon information and belief, competitors were forced to direct their human and financial resources at frivolous litigation, which impaired their competitive chances.  Given their need to fund on-going litigation, competitors could not afford to lower prices or otherwise invest in their organization.

65.   Upon information and belief, with its frivolous trademark infringement lawsuits, 1-800 hoped to usurp generic terms as protectable trademarks and thus prevent its competitors from describing their products and services.

66.   Upon information and belief, 1-800 transformed its competitor litigation into an efficient and well-oiled machine.   1-800 even generated a form complaint for the frequent lawsuits, which was always at the ready and required little more than a new caption from lawsuit to lawsuit.

67.   Upon information and belief, 1-800 pursued a common pattern in its lawsuits against competitors.   After filing the complaint, 1-800 normally pushed the deadline for defendants to respond; often several times.  1-800 used the extension periods to place additional pressure on its competitors.  1-800 framed the extensions as a final chance for its competitors to avoid protracted litigation and substantial expense.   1-800's competitors often concluded that settlement was the only choice, without regard to merits.   1-800 would voluntarily dismiss the lawsuits in such cases with no answer on file; often within weeks after 1-800 filed the complaint.

68.   Between 2005 and 2010 alone, 1-800 filed at least 15 lawsuits against its competitors.  In each instance, 1-800 sued its competitor without regard to the merits of its claims and without a genuine interest in redressing grievances, but rather to harass, neutralize and vanquish its competition.   In each instance, 1-800 used litigation as a mechanism to eliminate competition and expand its limited trademark rights far beyond their actual scope.

69.   **VISIONDIRECT**.    At all times material hereto, VisionDirect was a direct competitor of 1-800 in the Relevant Market.   VisionDirect sold replacement contact lenses to consumers at www.visiondirect.com, which it owned and operated.

70.   Upon information and belief, VisionDirect is a distant second place to 1-800 in the Relevant Market.  Nevertheless, upon information and belief, 1-800 has long viewed VisionDirect as an unacceptable threat to its monopoly power in the Relevant Market.

71.   In accordance with 1-800's frequent use of litigation as an anticompetitive weapon, 1-800 filed four lawsuits against VisionDirect between 2002 and 2008 in state and federal courts. 1-800 had little or no basis for the lawsuits and knew it.

72.   Upon information and belief, 1-800 extracted two horizontal "settlement" agreements from VisionDirect; the first on June 24, 2005 (the "2005 Agreement"), and the second on May 8, 2009 (the "2009 Agreement").  VisionDirect settled the lawsuits to avoid the mounting time and expense associated with the disputes and without regard to the merits.

73.   Under the 2005 Agreement, VisionDirect was prohibited from "causing [its] website or Internet advertisement to appear in response to any Internet search for [1-800's] brand name, trademark or URL."  It also prohibited VisionDirect from "causing [its] brand name, or link to [its] Websites to appear as a listing in the search results page of an Internet search engine, when the user specifically searches for [1-800's] brand name, trademark or URLs."

74.   Upon information and belief, VisionDirect and its counsel, Wilson Sonsini Goodrich & Rosati, expressed serious antitrust concerns about the enforceability of the 2005 Agreement as it relates to the implementation of negative keywords.  On January 24, 2008, Wilson Sonsini wrote 1-800's General Counsel:

> Separate and apart from Vision Direct's position regarding the interpretation of the contract, set forth in Ms. Caditz's November 5, 2007 letter—that is, that the Agreement does not contemplate the implementation of negative key words—Vision Direct continues to believe that any agreement between the parties with regard to the implementation of negative key words creates an unacceptable risk of violating Section 1 of the Sherman Act, and as such, represents a serious antitrust issue.  Any such agreement would appear to represent a restraint unrelated to the terms of the Agreement and unrelated to a valid intellectual property right, and one that depresses the price of key words to search companies such as Google, Yahoo! and Microsoft.

(Emphasis added.)

75.   Under the 2009 Agreement, 1-800 and VisionDirect agreed to implement negative keyword lists in connection with their Internet advertising efforts.  Upon information and belief, VisionDirect expressed concern about the antitrust law problems associated with 1-800's agreement.  VisionDirect expressed its concerns in the agreement, which provided:

> **RECITALS**
>
> WHEREAS, the Dispute arises out of the allegations that Vision Direct's Internet advertisement appeared in the search results pages of one or more Internet search engines when a user searched for 1-800 Contacts.
>
> WHEREAS, 1-800 Contacts claims that the appearance of such Internet advertisements violates the 2004 Settlement Agreement, and infringes 1-800 Contacts' trademarks;
>
> WHEREAS, Vision Direct and Drugstore.com have raised a concern that an agreement with a competitor to implement negative keywords could implicate the antitrust laws of the United Sates, and 1-800 Contacts has taken the position that no antitrust laws would be violated by such an agreement;

(Emphasis added.)

74.   **JSJ ENTERPRISES**.  At all times material hereto, JSJ Enterprises, Inc. was a direct competitor of 1-800 in the Relevant Market.  JSJ sold replacement contact lenses to consumers at www.contactlensconnection.com, which it owned and operated.

75.   On July 23, 2002, 1-800 sued JSJ in the District of Utah for unfair competition and trademark dilution.  1-800 claimed that JSJ had used its mark as a meta-tag.  1-800 had little or no basis for the lawsuit or its demands.

76.   1-800 and JSJ settled the lawsuit on August 20, 2002, less than one month after 1-800 filed the lawsuit.  Upon information and belief, JSJ capitulated to 1-800's anticompetitive settlement demands rather than incur the huge time and expense associated with litigation.

77.   **PREMIER HOLDINGS**.  At all times material hereto, Premier Holdings was a direct competitor of 1-800 in the Relevant Market.  Premier sold replacement contact lenses to consumers at www.ezcontactsusa.com and www.filmart.com, which it owned and operated.

78.   On December 6, 2007, 1-800 filed suit against Premier Holdings and three individual defendants in the District of Utah for trademark infringement, unfair competition, false designation of origin, false advertising, passing off, copyright infringement, and unjust enrichment.  1-800 requested in its Demand for Relief that the court issue an injunction that prevents the defendants "from using any variation of the 1-800 CONTACTS Marks and any other marks or names that are confusingly similar …," including, "other identifiers, keywords or other terms used to attract or divert traffic on the Internet or to secure higher placement within search engine search results."

/ / /

/ / /

79.     1-800 included a Google search screenshot in its complaint as visual evidence of Premier Holdings' alleged trademark infringement, which showed:

| Search Term | Sponsored Links (top section) | Sponsored Links (right-side section) |
|---|---|---|
| 1800 contacts | www.1800contacts.com | www.CoastalContacts.com<br>www.Lenscrafters.com<br>www.EzContactsUSA.com<br>www.ShipMyContacts.com<br>www.LensDiscounters.com |

80.     1-800 had little or no basis for the lawsuit or its demands.

81.     The parties entered into eight consecutive stipulations to extend the answer in order to "enable ongoing settlement negotiations to continue." 1-800 dismissed the lawsuit on May 13, 2008.   Upon information and belief, Premier Holdings capitulated to 1-800's anticompetitive settlement demands rather than incur the huge time and expense associated with litigation.

82.     **LENSWORLD**.   At all times material hereto, LensWorld was a direct competitor of 1-800 in the Relevant Market.   LensWorld sold replacement contact lenses to consumers at www.lensworld.com, www.contactmania.com and www.contactlensworld.com, which it owned and operated.

83.     1-800 sued LensWorld in the District of Utah on January 8, 2008 for trademark infringement, unfair competition, common law dilution, unjust enrichment and copyright infringement.   The complaint was almost identical to 1-800's previous complaint against Lens.

84.     1-800 complained that "[t]he ad for LensWorld's website is directly generated by a search for 1800 CONTACTS and thus, LensWorld uses the 1800 CONTACTS trademark as a triggering keyword to display and promote LensWorld's directly competitive goods and services." 1-800 included a Google search screenshot in its complaint as visual evidence of LensWorld's alleged trademark infringement, which showed:

| Search Term | Sponsored Links (top section) | Sponsored Links (right-side section) |
|---|---|---|
| 1800contacts | www.1800contacts.com | www.LensWorld.com<br>www.Lens.com<br>www.JustLenses.com<br>www.discountedcontactlense.com<br>www.ContactLens.com |

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

85.     In its Demand for Relief, 1-800 asked the court to issue an injunction that prevented LensWorld "from using any variation of the 1-800 CONTACTS Marks and any other marks or names that are confusingly similar …," including, "other identifiers, keywords or other terms used to attract or divert traffic on the Internet or to secure higher placement within search engine search results."  1-800 had no basis for the lawsuit or its demands.

86.     LensWorld requested an extension of time from 1-800 to answer the complaint after LensWorld missed the initial deadline of February 25, 2008.  1-800 refused to stipulate to an extension unless LensWorld "agree[d] to institute a negative keyword campaign that would prevent their sponsored advertisements from being generated in response to searches for [1-800's] trademarks and confusingly similar variations thereof while we negotiate a settlement in good faith."  LensWorld agreed and incorporated the requested negative keywords.

87.     In all, 1-800 and LensWorld stipulated to six separate extensions of the answer deadline to discuss settlement.  The final extension expired on July 25, 2008.  1-800 drafted and filed a motion for default judgment and proposed order on September 8, 2008.  1-800's proposed order directed that LensWorld "shall implement the negative keywords attached hereto as Exhibit A in any search engine advertising campaign performed for the benefit of [LensWorld], where possible, for so long as any one of [1-800's] federally registered trademarks remain active."  The list included 36 different search terms, including "www.contacts.com."  The proposed order was entered on September 9, 2008.

88.     **MEMORIAL EYE**.  At all times material hereto, Memorial Eye P.A. was a direct competitor of 1-800 in the Relevant Market.  Memorial Eye sold replacement contact lenses to consumers      at      www.shipmycontacts.com,      www.ship-my-contacts.com      and www.iwantcontacts.com, which it owned and operated.

89.     1-800 first complained to Memorial Eye about alleged trademark infringement in a September 13, 2005 demand letter.  1-800 instructed Memorial Eye to "immediately remov[e] **ALL** sponsored advertisements that you have purchased through Google, Yahoo Search, and any other search engines which are triggered by the 1800 CONTACTS trademark."

90.     Memorial Eye's responded through its outside counsel on October 13, 2005. Memorial Eye explained that it had "never used, or even considered using, [1-800's] trademark in its sponsored advertisements, or even as a search phrase trigger."  Memorial Eye also pointed out the inherent flaw in 1-800's accusation:  "The fact that your 'mark' includes the generic word 'contacts' will obviously results in a search triggering a multitude of other contact lens sites, including legitimate sponsored advertisements."

91.     Undeterred, 1-800 accused Memorial Eye of trademark infringement again on November 3, 2005.  This time, however, 1-800 demanded that Memorial Eye "add [a list of] negative keywords to any campaigns containing search terms related to contact lenses."  The list set forth 20 different search terms, including "contacts.com" and "800contacts."

92.     On September 12, 2007, 1-800 rehashed its prior accusations in a third demand letter to Memorial Eye.  In its response, Memorial Eye again explained the flaw in 1-800's argument and logic:  "The fact that 1800 Contacts, Inc.'s 'marks' include the generic word 'contacts' will obviously result in a search triggering a multitude of other contact lens sites, including legitimate sponsored advertisements."

93.     1-800 sued Memorial Eye in the District of Utah on December 23, 2008.  1-800 used the same complaint it had used in earlier lawsuits against its competitors in the Relevant Market, with claims for trademark infringement, unfair competition, common law dilution and unjust enrichment claims.

94.     1-800 complained that "[t]he www.shipmycontacts.com website advertisements are triggered upon a search for 1800CONTACTS and thus, use the 1800 CONTACTS trademark as a triggering keyword to display and promote Memorial Eye's directly competitive goods and services."

95.     1-800 included screenshots from two Google searches in its complaint as visual evidence of Memorial Eye's alleged trademark infringement, which showed:

| Search Term | Sponsored Links (top section) | Sponsored Links (right-side section) |
|---|---|---|
| 1800contacts | www.1800contacts.com | www.ShipMyContacts.com www.LensDiscounters.com www.AllAboutContactLens.Info |

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

| | | www.JustLenses.com<br>www.ContactLens.com/contacts |
|---|---|---|
| 1800contacts | www.1800contacts.com<br>www.ShipMyContacts.com | www.LensDiscounters.com<br>www.OptiContacts.com<br>www.ContactLens.com |

96.     1-800 asked for an order to prevent Memorial Eye "from using any variation of the 1-800 CONTACTS Marks and any other marks or names that are confusingly similar …," including, "other identifiers, keywords or other terms used to attract or divert traffic on the Internet or to secure higher placement within search engine search results."  1-800 had little or no basis for the lawsuit or its demands.

97.     Given the identical arguments and issues raised in 1-800's lawsuits against Memorial Eye and Lens, the court stayed this lawsuit pending the outcome of 1-800's lawsuit against Lens.

98.     **LENSFAST**.   At all times material hereto, Lensfast, L.L.C., was a direct competitor of 1-800 in the Relevant Market.   Lensfast sold replacement contact lenses to consumers at www.lensfast.com, www.contactlens.com, and www.e-contacts.com, which it owned and operated.  It also sold contacts over the telephone at 1-800 LENSFAST.

99.     1-800 accused Lensfast of trademark infringement in demand letters of September 12, 2007 and March 14, 2008.  Both times, 1-800 demanded that Lensfast "immediately remove **ALL** sponsored advertisements that you have purchased through Google, Yahoo Search, and any other search engines which are triggered by the 1800 CONTACTS trademark of a confusingly similar variation thereof."   1-800 demanded that Lensfast "incorporate [a] list of negative keywords in any continued sponsored advertisement campaign."   1-800 specified 30 different search terms on its list, including "www.contacts.com."

100.    On December 23, 2008, 1-800 sued Lensfast and Randolph Weigner in the District of Utah.  1-800 used the same complaint it had used in earlier lawsuits against its competitors in the Relevant Market, with claims for trademark infringement, unfair competition, common law dilution and unjust enrichment claims.

101.    1-800 complained that "[t]he www.lensfast.com website advertisements are

triggered upon a search for 1800CONTACTS and thus, use the 1800 CONTACTS trademark as a triggering keyword to display and promote Lensfast's directly competitive goods and services." 1-800 included a screenshot as visual evidence of Lensfast's allegedly offending practices.

102.    1-800 included screenshots from two Google searches in its complaint as visual evidence of Lensfast's alleged trademark infringement, which showed:

| Search Term | Sponsored Links (top section) | Sponsored Links (right-side section) |
|---|---|---|
| 1800contacts | www.1800contacts.com | www.VisionDirect.com www.LensWorld.com www.Lens.com www.ContactLens.com www.JustLenses.com www.discountedcontactlense.com |
| 1800contacts | www.1800contacts.com | www.ContactLens.com |

103.    1-800 asked for an order to prevent Lensfast and Mr. Weigner "from using any variation of the 1-800 CONTACTS Marks and any other marks or names that are confusingly similar …," including, "other identifiers, keywords or other terms used to attract or divert traffic on the Internet or to secure higher placement within search engine search results."  1-800 had little or no basis for the lawsuit or its demands.

104.    1-800 dismissed its lawsuit against Lensfast with prejudice on February 2, 2010. Upon information and belief, Lensfast capitulated to 1-800's prior settlement demands rather than incur the substantial fees and expenses associated with litigation.

105.    **LENSES FOR LESS**.  At all times material hereto, Lenses For Less was a direct competitor of 1-800 in the Relevant Market.  Lenses For Less replacement contact lenses to consumers at www.lensesforless.com, which it owned and operated.

106.    On January 20, 2010, 1-800 filed a lawsuit against Lenses For Less in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment. 1-800 had little or no basis for the lawsuit or its demands.

107.    While similar in tone to the previous complaints, 1-800 changed its form complaint against competitors in two important respects.  First, 1-800 did not include any screenshots of Google searches.  Second, 1-800 now claimed that all competitors must implement 1-800's list of negative keywords to avoid infringing upon 1-800's trademark.  Thus, inaction now served as the

basis of 1-800's lawsuits.  1-800 complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services."

108.    1-800 also changed its Demand for Relief.  1-800 now wanted an order directing its competitors to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns."

109.    1-800 voluntarily dismissed its lawsuit against Lenses for Less with prejudice March 29, 2010.  Lenses for Less never filed an answer.  Upon information and belief, Lenses for Less capitulated to 1-800's prior anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

110.    **ARLINGTON CONTACT LENS SERVICE**.  At all times material hereto, Arlington Contact Lens Service, Inc., d/b/a Discount Contact Lenses, was a direct competitor of 1-800 in the Relevant Market.  Arlington owned and operated www.discountcontactlenses.com and www.aclens.com.    Arlington sold replacement contact lenses to consumers at www.discountcontactlenses.com and www.aclens.com.

111.    Upon information and belief, Arlington is a distant fourth place to 1-800 in the Relevant Market.  Nevertheless, upon information and belief, 1-800 has long viewed Arlington as an unacceptable threat to its monopoly power in the Relevant Market.

112.    On February 18, 2010, 1-800 sued Arlington in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment.  1-800 requested an order directing Arlington to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns."  1-800 had little or no basis for the lawsuit or its demands.

113.    1-800 used the same complaint it used against Lenses For Less.  1-800 again complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead

voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services." 1-800 did not include any screenshots of Google searches in its complaint.

114.    1-800 voluntarily dismissed its lawsuit against Arlington on March 10, 2010, less than three weeks after it was filed. Upon information and belief, Arlington capitulated to 1-800's anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

115.    **EMPIRE VISION CENTER**. At all times material hereto, Empire Vision Center was a direct competitor of 1-800 in the Relevant Market. Empire sold replacement contact lenses to consumers at www.lens123.com, which it owned and operated.

116.    On February 25, 2010, 1-800 sued Empire in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment. 1-800 requested an order directing Empire to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns." 1-800 had little or no basis for the lawsuit or its demands.

117.    1-800 used the same complaint it used against Arlington and Lenses For Less. 1-800 complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services." 1-800 did not include any screenshots of Google searches in its complaint.

118.    After twice extending the Empire's answer deadline, 1-800 voluntarily dismissed its lawsuit with prejudice on May 17, 2010. Empire never answered. Upon information and belief, Empire capitulated to 1-800's anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

119.    **CONTACT LENS KING**. At all times material hereto, Contact Lens King was a direct competitor of 1-800 in the Relevant Market. Lens King sold replacement contact lenses to consumers at www.contactlensking.com, which it owned and operated.

120.     On March 8, 2010, 1-800 sued Lens King in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment.   1-800 requested an order directing Lens King to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns."  1-800 had little or no basis for the lawsuit or its demands.

121.     1-800 used the same complaint it used against Arlington, Empire and Lenses For Less.  1-800 complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services."  1-800 did not include any screenshots of Google searches in its complaint.

122.     On April 7, 2010, 1-800 stipulated to dismiss the lawsuit with prejudice.  Lens King never answered.  Upon information and belief, Lens King capitulated to 1-800's anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

123.     **TRAM DATA**.   At all times material hereto, Tram Data, LLC was a direct competitor of 1-800 in the Relevant Market.   Tram Data sold replacement contact lenses to consumers at www.replacemycontacts.com, which it owned and operated.

124.     On May 6, 2010, 1-800 sued Tram Data in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment.   1-800 requested an order directing Tram Data to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns."  1-800 had little or no basis for the lawsuit or its demands.

125.     1-800 used the same complaint it used against Arlington, Empire, Lens King and Lenses For Less.  1-800 complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services."  1-800 did not include any screenshots of Google searches in its complaint.

126.   On June 1, 2010, around three weeks after its filing, 1-800 stipulated to dismiss the lawsuit with prejudice.  Tram Data never answered.  Upon information and belief, Tram Data capitulated to 1-800's anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

127.   **WALGREEN COMPANY**.   At all times material hereto, Walgreen Co. was a direct competitor of 1-800 in the Relevant Market.   Walgreen sold replacement contact lenses to consumers at www.walgreens.com, which it owned and operated.

128.   1-800 accused Walgreen of trademark infringement in March 2010 and April 2010. Walgreen responded that it "does not currently use the name 1-800 CONTACTS or any combination of '800' and Contacts' as a search term or keyword."

129.   On June 8, 2010, 1-800 sued Walgreen in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment.   1-800 requested an order for Walgreen to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns."  1-800 had little or no basis for the lawsuit or its demands.

130.   1-800 used the same complaint it used against Arlington, Empire, Tram Data, Lens King and Lenses For Less.  1-800 complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services."  1-800 did not include any screenshots of Google searches in its complaint.

131.   On June 30, 2010, around three weeks after its filing, 1-800 and Walgreen stipulated to dismiss the lawsuit with prejudice.  Walgreen never answered.  Upon information and belief, Walgreen capitulated to 1-800's anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

132.   **STANDARD OPTICAL**.   At all times material hereto, Standard Optical was a direct competitor of 1-800 in the Relevant Market.   Standard Optical sold replacement contact lenses to consumers at www.standardoptical.net, which it owned and operated.

133.   On July 13, 2010, 1-800 sued Standard Optical in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment.   1-800 requested an order for Standard Optical to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns."   1-800 had little or no basis for the lawsuit or its demands.

134.   1-800 used the same complaint it used against Arlington, Empire, Walgreen, Tram Data, Lens King and Lenses For Less.   1-800 complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services."   1-800 did not include any screenshots of Google searches in its complaint.

135.   On February 7, 2011, 1-800 and Standard Optical stipulated to dismiss the lawsuit with prejudice.   Upon information and belief, Standard Optical capitulated to 1-800's anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

136.   **WEB EYE CARE**.   At all times material hereto, Web Eye Care, Inc. was a direct competitor of 1-800 in the Relevant Market.   Eye Care sold replacement contact lenses to consumers at www.webeyecare.com, which it owned and operated.

137.   On August 10, 2010, 1-800 sued Eye Care in the District of Utah for trademark infringement, unfair competition, false advertising and unjust enrichment.   1-800 requested an order for Eye Care to "implement the 1-800 Contacts marks and all confusingly similar variations and misspellings thereof as negative keywords in all of their search engine advertising campaigns."   1-800 had little or no basis for the lawsuit or its demands.

138.    1-800 used the same complaint it used against Arlington, Empire, Tram Data, Lens King, Standard Optical and Lenses For Less.   1-800 complained that "Defendant has not sufficiently implemented the 1-800 Contacts marks (and confusingly similar variations or misspellings thereof) as negative keywords, but has instead voluntarily and consciously participated in causing its competitive advertisements to be displayed in response to consumers searching for the 1-800 Contacts marks and Plaintiff's Goods and Services."   1-800 did not include any screenshots of Google searches in its complaint.

139.    On September 13, 2010, 1-800 stipulated to dismiss the lawsuit with prejudice. Eye Care never answered.   Upon information and belief, Eye Care capitulated to 1-800's anticompetitive demands rather than incur the substantial fees and expenses associated with litigation.

*1-800'S HARASSMENT AND FRIVOLOUS LAWSUIT AGAINST LENS.COM*

136.    Upon information and belief, Lens is a distant third place to 1-800 in the Relevant Market.   Nevertheless, upon information and belief, 1-800 has long viewed Lens as an unacceptable threat to its monopoly power in the Relevant Market.

137.    1-800 began its harassment of Lens in or around 2005 pursuant to a pattern and 1-800's business practice of threatening and suing competitors in the Relevant Market without regard to the merits and for an unlawful purpose.

138.    1-800 first accused Lens of a "targeted scheme to infringe upon the 1-800 CONTACTS trademark" in a demand letter from 1-800's in-house counsel on September 1, 2005. 1-800 explained the basis for its accusation:  An advertisement for Lens was "triggered upon a search for '1800 CONTACTS' and thus, uses the 1800 CONTACTS trademark as a triggering keyword to advertise for your directly competitive goods and services."

139.    1-800 demanded that Lens cease and desist from all infringing activities and ensure that Lens ads never appear when "1800 CONTACTS" is entered as a search term in Google, Yahoo or any other Internet search engine.  1-800 included screenshots from Google and other Internet search engines as visual evidence of Lens' alleged infringement.

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

140.     More accusations followed from 1-800 in late 2005 and mid-2007.  1-800 again attached screenshots from Google and other Internet search engines as visual evidence of Lens' alleged trademark infringement.

141.     1-800 sought to extract a horizontal agreement from Lens to settle its manufactured trademark dispute.  The proposed terms would have expanded 1-800's limited trademark rights beyond recognition.  The terms also demanded that Lens police the Relevant Market for what 1-800 perceived as a violation of 1-800's trademark rights.

142.     Upon information and belief, if Lens refused the agreement, 1-800 intended to both overwhelm Lens with enormous litigation expenses and distract Lens with scorched-earth litigation tactics.  1-800 wanted to make sure that Lens was forced to redirect its human and financial resources to the litigation, rather than competition on the merits.

*THE LAWSUIT*

143.     Lens refused to accept 1-800's horizontal agreement.  On August 18, 2007, 1-800 sued Lens in the District of Utah for federal trademark infringement, federal unfair competition and false designation of origin, common law unfair competition, misappropriation, and trademark infringement, state law unfair practices, unjust enrichment, breach of contract and state unfair competition.  *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, No. 2:07-cv-00591 (D. Utah).

144.     1-800 filed its trademark infringement lawsuit against Lens in bad faith and forced Lens to incur massive litigation costs (in excess of $1,400,000).  1-800's litigation crusade constituted a serious threat to competition.

145.     1-800 complained that "[t]he www.Lens.com and www.Justlenses.com website advertisements are triggered upon a search for 1800 CONTACTS and thus, use the 1800 CONTACTS trademark as a triggering keyword to display and promote Lens.com's direct competitive goods and services."

///

///

///

///

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

146.   1-800 included three screenshots of Google searches in its complaint as visual evidence of Lens' alleged trademark infringement, which show:

| Search Term | Sponsored Links (top section) | Sponsored Links (right-side section) |
|---|---|---|
| 1800 CONTACTS | www.1800contacts.com | www.Lens.com<br>www.LensWorld.com<br>www.ShipMyContacts.com<br>www.JustLenses.com |
| 1800contact | www.1800contacts.com | www.Acuvue.com<br>www.LensWorld.com<br>www.JustLenses.com |
| 1800contacts | www.1800contacts.com<br>www.Lens.com, | www.JustLenses.com<br>www.LensWorld.com<br>www.discountedcontactlense.com |

147.   Ironically, 1-800 was engaged in identical practices to those it sued Lens and other competitors for; and on a much larger scale.  Upon information and belief, 1-800 purchased 13 keywords that contained or reflected Lens' service marks, which generated 8,477 hits for 1-800 and profits of $219,314.00.

148.   1-800 alleged that Lens and 1-800 had entered a horizontal non-compete agreement in September 2005, which Lens later breached.   1-800's counsel described the horizontal agreement as follows:  "The main thrust of the agreement was that neither parties' advertisements should be appearing on Internet searches for the tradename of the other, if informed of such occurrence.  More specifically, upon notice of any such advertisement, Lens.com would ensure that no advertisements for Lens.com would appear in response to searches for 1-800 Contacts' trademarks on Internet search engines."

149.   In its Demand for Relief, 1-800 requested that the court issue an injunction to prevent Lens.com "from using any variation of the 1-800 CONTACTS Marks and any other marks or names that are confusingly similar …," including, "sponsored advertising triggers, other identifiers, keywords or other terms used to attract or divert traffic on the Internet or to secure higher placement within the search engine results."

150.   Given that Lens only operated on the Internet, this lawsuit would ensure the demise of Lens if 1-800 prevailed and further reduce the competitive pressures on 1-800.

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

*1-800 SPENDS $1,100,000 IN LITIGATION FEES IN*
*ITS VIGOROUS PURSUIT OF $20.51 IN DAMAGES*

151.    1-800 unleashed the litigation equivalent of a thermonuclear war against Lens in response to the damage equivalent of a hangnail.    In the end, 1-800 spent around $1,100,000 in litigation fees in order to chase $20.51 in damages but, more importantly, to put Lens out of business.

152.    1-800 understood that it suffered little or no damage from the alleged conduct it attributed to Lens, even if it prevailed.  At most, 1-800's claim against Lens implicated nine (9) variations of 1-800 keywords that generated only about 25 total clicks and **$20.51** in profits for Lens.

153.    Notwithstanding its damage ceiling, 1-800 poured enormous financial and other resources into the Lens lawsuit.  After 12 months of litigation, 1-800 had spent **$653,374.15** in fees and expenses.  And 1-800 was prepared to spend far more to make its point.  The Radar Firm that represented 1-800 promised to discount its services and not bill more than **$750,000** in 2008, and the Radar Firm later agreed to cap its fees in the Lens litigation at **$1,100,000** from inception to conclusion.  *See Rader Fishman & Grauer, PPLC v. 1-800 CONTACTS, Inc.*, No. 2:10-cv-00191 (D. Utah).

*1-800 SCRAMBLES TO DISTANCE ITSELF FROM PRIOR ACCUSATIONS AGAINST LENS*

154.    On August 15, 2008, after one full year of litigation, 1-800 abruptly changed its theory and asked for permission to assert that Lens was secondarily liable for the trademark infringement of its affiliates.

155.    In March of 2009, during a flurry of last-minute dispositive motion practice, 1-800 tried to further distance itself from the accusations it leveled at Lens in its August 2007 complaint. 1-800 reframed its lawsuit as follows:  "[T]he primary thrust of this cases [sic] involves the keyword activities of Lens.com Affiliates."

*1-800'S LAWSUIT IS TOSSED AND DISTRICT COURT RAISES ANTITRUST CONCERNS*

156.    On December 14, 2010, the district court dismissed 1-800's lawsuit in an extensive 65-page Memorandum Decision and Order from Judge Clark Waddoups.

157.    The court found that **"[1-800] has presented no evidence to show that [Lens] ever purchased [1-800's] exact service mark as a keyword**." (Emphasis added.)  At most, according to the Memorandum Decision, 1-800's lawsuit against Lens boiled down to Lens' use of nine misspellings or variations of a mark that generated about 25 clicks and $20.51 in profits for Lens.

158.    The district court determined that "1800 Contacts" was a weak mark in the Internet search engine context because the "nature of how third parties use generic and descriptive words on search engines" suggested that users who entered the term were likely searching for a type of product.

159.    In dismissing 1-800's claim for secondary trademark infringement, Judge Waddoups expressed frustration with 1-800's shotgun approach and failure to explain or develop the claim.  According to the Memorandum Decision and Order:

a)      "The court notes that this decision was greatly complicated by the imprecise pleadings of [1-800].  Throughout its briefing, it failed to sort out the actions of [Lens] from its affiliates, true trademarks from marks it merely asserts are trademarks, and so forth.  Such pleading forces the court to do the work that should have been done by the party and does little to advance one's case."

b)      "In its Amended Complaint, [1-800] asserts a claim for secondary infringement against [Lens] that lumps all theories of secondary liability under one cause of action.  In its briefing for summary judgment, [1-800] also takes little care to sort out the different theories of secondary infringement, despite the fact that they have different elements."

c)      "The court will not consider theories of liability that a plaintiff spends so little effort in developing.  It is the party's role to present evidence and develop theories, not the court's to cull through the evidence to see if a theory may be supported."

160.    In dismissing 1-800's trademark infringement claim, Judge Waddoups questioned whether 1-800's argument and conduct raised antitrust law concerns.   According to the Memorandum Decision and Order:   "As stated above, Plaintiff sends cease and desist letters anytime a competitor's advertisement appears when Plaintiff's mark is entered as a search term.  Were Plaintiff actually able to preclude competitor advertisements from appearing on a search-

1  results page anytime its mark is entered as a search term, it would result in an anti-competitive,

2  monopolistic protection, to which it is not entitled. Because a consumer cannot see a keyword, nor

3  tell what keyword generated an advertisement, the court concludes that the mere purchase of a

4  trademark as a keyword cannot alone result in consumer confusion. Accordingly, the relevant

5  inquiry here regarding consumer confusion is not just what keyword was purchased, but what was

6  the language of the advertisement generated by that keyword."

7       161.   In dismissing 1-800's breach of contract claim, Judge Waddoups expressed

8  skepticism that the alleged contract between 1-800 and Lens could survive an antitrust challenge.

9  According to the Memorandum Decision and Order:  "Were this actually an agreement entered

10  into by the parties, the court questions whether it would survive an antitrust challenge.  [1-800]

11  does not seek merely to preclude usage of its trademark. Instead, it wants to obliterate any other

12  competitor advertisement from appearing on a search-results page when a consumer types in

13  '1800Contacts' as a search term or some variation of it. This is disturbing given that broad

14  matching of the generic term 'contacts' could trigger an advertisement if a consumer enters the

15  search term '1800Contacts.'   A trademark right does not grant its owner the right to stamp out

16  every competitor advertisement."

17       162.   1-800 was also exposed as duplicitous.  According to the Memorandum Decision,

18  1-800 had purchased 13 keywords that reflected Lens' service marks, which brought 8,477 hits to

19  1-800 and profits of $219,314.00.  Judge Waddoups explained: "In comparison, from about 2002

20  through 2008, [1-800] purchased the following keywords from Google: 1 800 lens; 1 800 lense; 1

21  800 lenses; 1 800 the lens; 1 800 Lens; 1-800 lens; 1800 lenses; 1800lens; 1800lenses; 1-800-

22  lenses; 800 lens; 800 lenses; 800lens. These keywords generated 91,768 impressions, 8,477 clicks,

23  and about $219,314 in profits for [1-800]."

24       163.   Although it lost on the merits after 3 years of litigation, 1-800 is not done. 1-800

25  now hopes to reopen its frivolous lawsuit based on alleged "new" evidence and further deplete the

26  limited resources of Lens with continued litigation.  1-800 has no basis to reopen the lawsuit.

27  Contrary to its representations, the "new" evidence is not new.  The District of Utah dismissed 1-

28

800's lawsuit on December 14, 2010, while 1-800 so-called "new evidence" is from November 30, 2009.

164.   Upon information and belief, 1-800 had and has no legitimate competitive justifications for its practices, which neither reduced distribution costs, facilitated competition nor achieved efficiencies.

165.   Upon information and belief, the sole purpose of 1-800's conduct was to protect and extend its dominance in the Relevant Market.  Any manufactured business justifications are mere pretext.

166.   Any efficiencies or cost savings that 1-800 might claim to achieve with its conduct could be achieved through alternative, less-restrictive means that do not harm competition.

## COMPETITIVE EFFECTS

167.   1-800's anticompetitive practices have had a direct, substantial and adverse effect on competition in the Relevant Market.

168.   1-800's horizontal agreements have increased consumer search costs by hindering consumers from obtaining valuable information about the various alternatives available from sellers.

169.   Consumers in the Relevant Market have been denied the fruits of competition, including greater choice, superior products and services, and lower prices.  1-800 has used threats and litigation to expand its limited trademark rights far beyond their actual scope and otherwise restrict the menu of choices for consumers.  1-800 has extracted horizontal agreements from competitors to restrict output and consumer choice.  Customers in the Relevant Market have been denied the benefits of innovation, including greater convenience and increased efficiencies.  Although consumers benefit and profit from greater information upon which to make informed purchasing decisions, 1-800 has worked to prevent consumers from receiving such information and otherwise engaging in comparative advertising.

170.   Competition in the Relevant Market between 1-800 and its competitors (actual and prospective) has been suppressed and/or eliminated.  1-800 has used litigation as a mechanism to deplete the financial and human resources of its competitors.  1-800 has forced competitors to

incur substantial litigation expenses.  1-800 has prohibited competitors in the Relevant Market from engaging in perfectly acceptable forms of advertising.  1-800 claimed exclusive control and rights over words that were freely available to all competitors and used its bogus claims to coerce unreasonable restraints of trade and to acquire and/or extend its monopoly power.  1-800 has prevented competitors from using common, generic terms to attract customers and describe their products in the Relevant Market.  1-800's extorted settlements have foreclosed and continue to foreclose a substantial share of the Relevant Market, and impede the ability of prospective and actual competitors to compete against 1-800 on the merits.  1-800's conduct makes it difficult for prospective and actual competitors to achieve efficient scale and attract a sufficient customer base in the Relevant Market.

171.    1-800 has restricted output in the Relevant Market.  Advertising is an important component of a firm's output and essential to effective distribution; and the relationship between advertising and low prices is plain.

172.    1-800 has facilitated collusion by eliminating various avenues down which competition can occur.  By restricting advertising, 1-800 has made it far more difficult for individual firms to communicate additional services to consumers (e.g., free delivery, stocking, extended warranties, or other collateral services), thus stabilizing competition between and among the competitors.

173.    Left unchecked, 1-800's pattern of conduct will continue its intended effect of harming competition in the Relevant Market.  Actual and prospective competitors will be excluded from the Relevant Market and customers will be forced to spend more for less.

### FIRST CLAIM FOR RELIEF
**(Horizontal Restraint of Trade – 15 U.S.C. § 1)**

174.    Lens incorporates by reference all allegations contained above.

175.    1-800 has entered into various unlawful contracts, combinations or conspiracies that unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act.

176.    1-800 extracted anticompetitive concessions from its direct competitors in the settlement agreements that fell outside the scope of its actual trademark rights and the limited protection granted by trademark laws.

177.    1-800's horizontal agreements are per se unlawful.   In the alternative, 1-800's horizontal agreements are unlawful under the rule of reason.

178.    1-800 entered into the arrangements with the purpose and effect of unreasonably restraining trade and commerce in the Relevant Market.

179.    The probable effect of the arrangements is to foreclose competition in a substantial share of the Relevant Market.

180.    1-800's conduct has had anticompetitive effects in the Relevant Market, including those described above.

181.    Lens has been injured in its business or property due to 1-800's conduct.

### SECOND CLAIM FOR RELIEF
#### (Monopoly Maintenance – 15 U.S.C. § 2)

182.    Lens incorporates by reference all allegations contained above.

183.    1-800 has engaged in unlawful monopoly maintenance in the Relevant Market in violation of Section 2 of the Sherman Act.

184.    1-800 possesses monopoly power in the Relevant Market.

185.    Through the anticompetitive and predacious conduct described herein, 1-800 has willfully maintained and, unless restrained by the Court, will continue to willfully maintain its monopoly power through anticompetitive and unreasonably exclusionary means.

186.    1-800 has acted with an intent to illegally maintain 1-800's monopoly power in the Relevant Market.

187.    1-800 has directly and proximately prevented actual and prospective competitors from obtaining a significant, non-trivial share of the Relevant Market.

188.    1-800's conduct has had anticompetitive effects in the Relevant Market, including those described above.

189.    Lens has been injured in its business or property due to 1-800's conduct.

### THIRD CLAIM FOR RELIEF
#### (Attempted Monopoly – 15 U.S.C. § 2)

190.    Lens incorporates by reference all allegations contained above.

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

191.     1-800 has engaged in anticompetitive conduct in an attempt to monopolize the Relevant Market.

192.     1-800 has acted with specific intent to achieve a monopoly in the Relevant Market.

193.     Given 1-800's substantial market share and size, there is a dangerous probability that, unless restrained, 1-800 will achieve monopoly power in the Relevant Market.

194.     1-800's conduct has had anticompetitive effects in the Relevant Market, including those described above.

195.     Lens has been injured in its business or property due to 1-800's conduct.

## FOURTH CLAIM FOR RELIEF
### (Nevada Unfair Trade Practices Act)

196.     Lens incorporates by reference all allegations contained above.

197.     1-800 has entered into unlawful horizontal contracts, combinations or conspiracies with its competitors in violation of NEV. REV. STAT. § 598A.060.

198.     1-800 has engaged in unlawful monopoly maintenance in the Relevant Market in violation of NEV. REV. STAT. § 598A.060.

199.     1-800 has engaged in exclusionary conduct in an attempt to monopolize the Relevant Market in violation of NEV. REV. STAT. § 598A.060.  1-800 has acted with specific intent to achieve a monopoly in the Relevant Market.  Given its substantial size and market share, a dangerous probability exists that, unless restrained, 1-800 will achieve monopoly power in the Relevant Market.

200.     1-800's conduct has had anticompetitive effects in the Relevant Market, including those described above.

201.     Lens has been injured, or is threatened with injury or damage, in its business or property due to 1-800's conduct.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Relief Pursuant to 28 U.S.C. § 2201)

202.     Lens incorporates by reference all allegations contained above.

203.     After on summary judgment in 2010 in the Utah litigation, 1-800 is still not done attempting to stamp out legitimate competition from Lens.

204.    On February 11, 2011, the court in the Utah litigation issued an Order to Show Cause requiring that if a party believed that all issues had not been resolved, that party was ordered to show cause on or before March 10, 2011 why the case should not be closed. Absent a showing of good cause, the court in Utah indicated that the case would be closed on March 11, 2011.

205.    1-800 did not respond to the show cause order.  Instead, on April 20, 2011, more than 4 months after the court in Utah entered summary judgment against 1-800, 1-800 filed a motion deceptively titled "MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT BASED ON NEWLY DISCOVERED EVIDENCE OF INFRINGEMENT."   Incredibly, the "new" evidence alleged by 1-800 is search results on the Bing Shopping Site -- search results from 2009 shown in the screen capture below.  The search is specifically for finding other vendors who sell a particular product.



206.    The comparison done by Bing does not constitute "commercial use" of  1-800's marks nor does it constitute infringement of 1-800's alleged trademark rights in violation of the Lanham Act, 15 U.S.C. § 1125(a)  When a Bing search engine user searched for "1-800" the search engine's "shopping" feature returned a list of the products it sold and indicated how many other businesses were in its data base that also sold the same product.  The user could then go to the competitors' websites who carry this product and compare prices.

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

207.     Despite the inability of the court in Utah to hear these claims, the fact that 1-800 has attempted to assert these claims against Lens shows clearly that there is an actual case or controversy and that Lens has a reasonable apprehension of litigation.  Indeed, 1-800 sent a letter to Lens in Nevada containing this threat and this threat was also contained in the motion submitted the court in Utah litigation.

208.     Lens further seeks a declaration that 1-800 take nothing by way of its claims asserted against Lens; a declaration and adjudication of the rights and liabilities of the parties with regard to the 1-800 marks and uses thereof as it relates to this dispute; a declaration that any claims brought by 1-800 against Lens with respect to the 1-800 marks be dismissed with prejudice; a declaration that Lens' alleged use of the 1-800 mark in the Bing search engine, as shown above, and any other similar claims later raised by 1-800, are lawful and do not infringe upon any rights of 1-800; and a declaration of Lens' continued right to use the 1-800 marks for comparison advertising on Internet search engines or elsewhere, free and clear of interference or harassment by 1-800 and without any obligation or liability to 1-800.

### SIXTH CLAIM FOR RELIEF
**(Unfair Competition – Nevada Common Law)**

209.     Lens incorporates by reference all allegations contained above.

210.     1-800 has used and continues to use its alleged trademark rights to unfairly compete with and deter fair competition by its competitors, including Lens.

211.     1-800 has used and continues to engage vexatious and sham trademark litigation against its competitors, including Lens, in an effort to impede them from engaging in fair competition and to eliminate them as competitors.

212.     1-800 has used its alleged trademark rights and vexatious and sham trademark litigation to coerce its competitors, including Lens, to enter into unlawful horizontal restraints on competition.

213.     Lens has been injured, or is threatened with injury or damage, in its business or property due to 1-800's conduct.

## SEVENTH CLAIM FOR RELIEF
### (Abuse of Process)

214.   Lens incorporates by reference all allegations contained above.

215.   On or about August 18, 2007, 1-800 initiated a legal process by filing the lawsuit captioned <u>1-800 Contacts, Inc., v. . Lens.com, Inc.</u>, Case No. 2:07cv00591, in the United States District Court for the District of Utah.

216.   Upon information and belief, 1-800 filed suit with unlawful ulterior purposes or motives, including, but not limited to: (1) deterring Lens from engaging in lawful competition, including in connection with advertising on the Internet through the use of sponsored links triggered by bidding on generic terms; and (2) attempting to impose and imposing on Lens substantial attorneys' fees and costs in an effort to deter Lens from defending its lawful competition.

217.   Upon information and belief, in the Utah litigation, 1-800 engaged in numerous willful acts in the use of the legal process not proper in the regular conduct of the proceeding, including, but not limited to: (1) pursuing the Utah litigation when it knew that it had no legitimate basis for doing so; (2) making frivolous and/or misleading arguments to the court regarding the nature and scope of 1-800's trademark rights and the nature and use of certain search terms in connection with sponsored links; (3) marking frivolous arguments regarding Lens' alleged secondary liability for the alleged action of affiliates; (4) imposing more than $1 Million in legal fees and costs on Lens in an action involving, at most, $20.51 in profits; and (5) after the close of the case, seeking to continue the litigation based on alleged new evidence that 1-800 knew was not new and which did not form the basis for any legitimate claims.

218.   1-800 engaged in such abuse of process with no reasonable justification or privilege.

219.   1-800's actions were done intentionally and with malice or such reckless disregard to the rights of Lens such  that malice can be presumed, thus making this claim appropriate for punitive damages.

220.   Lens has suffered damages in an amount that will be proven at trial.

221.    Lens also demands an award of punitive damages in the amount to be determined by the jury so as to punish and discourage 1-800 from these actions in the future.

### EIGHTH CLAIM FOR RELIEF
### (Prima Facie Tort)

222.    Lens incorporates by reference all allegations contained above.

223.    1-800 is liable for intentionally doing that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade.

224.    1-800 committed an unjustified, intentional infliction of harm on Lens, which resulted in damages, by one or more acts that would otherwise be lawful.

225.    1-800 engaged in such conduct  with no reasonable justification or privilege.

226.    1-800's actions were done intentionally and with malice or such reckless disregard to the rights of Lens such that malice can be presumed, thus making this claim appropriate for punitive damages.

227.    Lens has suffered damages in an amount that will be proven at trial.

228.    Lens also demands an award of punitive damages in the amount to be determined by the jury so as to punish and discourage 1-800 from these actions in the future, as well as attorneys fees and the costs of this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests the following relief:

A.      Judgment on all counts in favor of Lens and against 1-800;

B.      A declaration that Lens is not engaged in any activity that infringes upon any alleged trademark rights of 1-800 (and for the other declaratory relief identified in the above);

C.      An award of compensatory, consequential, incidental, treble and punitive damages in favor of Lens and against 1-800 in an amount to be determined at trial;

D.      An injunction to enjoin and restrain the 1-800 from engaging in any of the illegal conduct identified in the Complaint;

E.      Attorneys' fees, costs and expenses of bringing this lawsuit, with interest at the highest legal rate until paid in full; and

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

2398604

1     F.    An award of such other relief that the Court may deem proper, necessary or

2  appropriate.

3     DATED this 6th day of June, 2011.

4                 Respectfully submitted,

5                 LEWIS AND ROCA LLP

6

7                 By:   /s/ Michael J. McCue
                     Michael J. McCue (Nevada Bar No. 6055)

8                     mmccue@LRLAW.com
                     3993 Howard Hughes Parkway, Ste. 600

9                     Las Vegas, Nevada 89169
                     Tel:  (702) 949-8200

10                   Fax:  (702) 949-8363

11                   David D. Weinzweig *(Admitted pro hac vice)*

12                   dweinzweig@LRLAW.com
                     LEWIS AND ROCA LLP

13                   40 North Central Avenue
                     Phoenix, Arizona 85004

14                   Tel: (602) 262-5311
                     Fax: (602) 262-5358

15

16                 Attorneys for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28